690 S.E.2d 777

**G. Dana SINKLER and Anchorage Plantation Home Owners Association, Petitioners,**

v.

**COUNTY OF CHARLESTON, Charleston County Council and Theodora Walpole and John D. Walpole, Respondents.**

No. 26787.

Supreme Court of South Carolina.

Heard Jan. 21, 2010.

Decided March 15, 2010.

68

G. Trenholm Walker, Francis M. Ervin, and Sara E. De-Wolf, all of Pratt–Thomas & Walker, of Charleston, for Petitioners.

County Attorney Joseph Dawson, III, Deputy County Attorney Bernard E. Ferrara, Jr., Assistant County Attorney Austin A. Bruner, all of North Charleston; and Gerald M. Finkel, of Finkel Law Firm, of Charleston, for Respondents.

Justice BEATTY.

G. Dana Sinkler and Anchorage Plantation Home Owners Association (collectively, Petitioners) brought this action against the County of Charleston, Charleston County Council, and Theodora and John D. Walpole (collectively, Respondents) challenging an ordinance rezoning the Walpoles' property, Anchorage Plantation, from agricultural to a Planned Development (PD) district. Upon review, the circuit court ruled the ordinance was invalid and that the property should retain its agricultural classification. The Court of Appeals reversed, holding the rezoning to a PD was proper. *Sinkler v. County of Charleston*, Op. No.2008–UP–297 (S.C. Ct.App. filed June 5, 2008). We granted a petition for a writ of certiorari to review the decision of the Court of Appeals and now reverse.

## I. FACTS

### A. Background of Dispute.

The South Carolina Local Government Comprehensive Planning Enabling Act of 1994 (the Enabling Act) granted local governments the authority to create planning commissions to implement comprehensive plans governing development in their communities.[1] In 1999, Charleston County Council enacted the County of Charleston Comprehensive Plan.

The Comprehensive Plan designated Wadmalaw Island part of the Agricultural Area of Charleston County, where the preferred land uses included farming and resource management, along with "preservation of the rural community character." The Comprehensive Plan further provided that development in areas classified as Agricultural Preservation within the Agricultural Area "should primarily support the needs of

---

1. *See* S.C.Code Ann. § 6–29–320 (2004) ("The county council of each county may create a county planning commission."); *id.* § 6–29–510(A) (stating a local planning commission shall develop and maintain a comprehensive plan to guide development in its area of jurisdiction).

the farming industry, secondarily allowing for compatible residential development."

The Enabling Act permits the governing body of a county to adopt zoning ordinances to help implement a comprehensive plan. S.C.Code Ann. § 6–29–720 (2004 & Supp.2009). Charleston County Council enacted the Charleston County Zoning and Land Development Regulations (ZLDR) in 2001 to implement its Comprehensive Plan.

Petitioners separately own properties on Wadmalaw Island that are adjacent to a tract of land (roughly 750 acres) owned by the Walpoles. The Walpoles' property was used as a tomato farm and was zoned AG–15, an Agricultural Preservation classification.

Under the ZLDR, the AG–15 classification allows a "maximum density" of one dwelling unit per fifteen acres on interior land, with a "minimum lot area" of three acres. ZLDR § 4.4.3(A). For land within one thousand feet of the OCRM [2] critical line, the AG–15 zoning classification allows a maximum density of one dwelling unit for every three acres. ZLDR § 4.4.3(B). The configuration of the Walpoles' land limited it to a maximum of 107 dwellings under the AG–15 zoning restrictions.

On June 20, 2003, the Walpoles applied to have their property rezoned to a PD district. Charleston County Council adopted an ordinance rezoning the Walpoles' property from AG–15 to a PD district on February 17, 2004. Under the ordinance, the minimum lot size was reduced to one acre, although the allowed uses remained the same as those under the AG–15 classification. The maximum number of dwellings on the property remained unchanged at 107.

Petitioners brought this declaratory judgment action in 2004, asserting the ordinance rezoning the Walpoles' property was invalid because Charleston County Council exceeded its authority and violated provisions of the Enabling Act and the ZLDR in approving the change.

---

2. OCRM refers to the Office of Ocean and Coastal Resource Management of the South Carolina Department of Health and Environmental Control.

**B. Circuit Court's Ruling.**

The circuit court found the ordinance rezoning the Walpoles' property from AG–15 to a PD district was invalid and that the property remained zoned AG–15. The circuit court concluded Charleston County Council exceeded its authority and violated the provisions of both (1) the Enabling Act and (2) the ZLDR.

**(1) The Enabling Act.** The circuit court first found the ordinance did not meet the essential standards for establishing a PD as provided by sections 6–29–720 and –740 of the Enabling Act.

The circuit court stated the ordinance violated section 6–29–720, governing zoning methods, because the proposed PD plan that was approved failed to meet the statute's definition of a PD. Section 6–29–720 defines a PD as follows:

> [A] development project comprised of *housing of different types and densities and of compatible commercial uses, or shopping centers, office parks, and mixed-use developments.* A planned development district is established by rezoning prior to development and is characterized by a unified site design for a mixed use development[.]

S.C.Code Ann. § 6–29–720(C)(4) (Supp.2009) (emphasis added).

The circuit court noted the development in the proposed area is residential, the same type of development that is already authorized under its current zoning of AG–15. The court stated, "Distilling the PD Ordinance to its essence, its primary effect was simply to reduce the minimum lot size for the up–to–107 residential dwelling units."

The court found the PD plan submitted to Charleston County does not call for "housing of different types and densities and of compatible commercial uses, or shopping centers, office parks, and mixed-use developments," nor is it "characterized by a unified site design for a mixed use development" as required by section 6–29–720(C)(4).

Respondents had alternatively argued that County Council could implement its own zoning districts and did not have to meet the requirements of a PD district provided in the Enabling Act, based on the portion of section 6–29–720(C) that reads as follows:

The zoning ordinance may utilize the following [listing cluster developments, floating zones, performance zoning, and planned development districts, among others] or any other zoning and planning techniques for implementation of the goals specified above. Failure to specify a particular technique does not cause use of that technique to be viewed as beyond the power of the local government choosing to use it[.]

S.C.Code Ann. § 6–29–720(C).

The circuit court observed that, "[w]hile the County is correct that the legislature did not confine it to the categories of zoning districts listed in S.C.Code Ann. § 6–29–720(C), in this instance the County actually employed one of the enabling statute's specifically defined categories, 'planned development district,' and specifically referred to the Enabling Act as the basis for its authority in § 3.5.1, ZLDR." Accordingly, the circuit court concluded the ordinance was intended to implement a PD as described in section 6–29–720(C) rather than "some new, alternative . . . zoning category."

The circuit court further found the ordinance violated section 6–29–740 of the Enabling Act, entitled "Planned development districts," which allows variances from lot size, use, and density requirements contained in other ordinances and regulations through establishment of a PD. Section 6–29–740 provides in relevant part:

In order to achieve the objectives of the comprehensive plan of the locality and to allow flexibility in development that *will result in improved design, character, and quality of new mixed use developments* and preserve natural and scenic features of open spaces, the local governing authority may provide for the establishment of planned development districts as amendments to a locally adopted zoning ordinance and official zoning map. The adopted planned development map is the zoning district map for the property. *The planned development provisions must encourage innovative site planning for residential, commercial, institutional, and industrial developments within planned development districts.*

S.C.Code Ann. § 6–29–740 (2004) (emphasis added).

The court found that, in comparison to the AG–15 zoning, the proposed PD plan simply reduces the required lot size

from three acres to one acre, but it includes "no elements that result in improved design, character, and quality of a new mixed use development." The court stated the proposed plan calls for up to 107 residential dwellings, but the AG–15 zoning already allows this residential use, so "the proposed plan cannot ... be considered to be a 'new mixed use development.'" The court also noted the proposed plan does not specifically identify any particular land as open space or impose any requirement that the owners preserve open space; moreover, "the proposed plan does not result in more open space than AG–15 zoning, since each would allow up to 107 single family houses."

(2) **The ZLDR.** As an additional ground for invalidating the ordinance, the circuit court found the ordinance violated the ZLDR. The court noted the ZLDR sections defining the AG–10 and AG–8 zoning districts include the provision that an owner may reach maximum density only through the PD process, citing § 4.5.3(B), ZLDR (for AG–10) and § 4.6.3(B), ZLDR (for AG–8). "On the other hand, the ZLDR sections governing the more restrictive AG–25 and AG–15 districts have no parallel provision allowing any adjustment to any of the standards through a planned development district or the 'Planned Development process.'" The court concluded County Council did not intend for a property owner to be able to reduce the residential standards of property zoned AG–15 through a PD process and that the ZLDR do not allow the use of a PD to modify the restrictions of the AG–15 district for residential development.

## C.   Review by the Court of Appeals.

The Court of Appeals reversed, finding the Walpoles' property was properly rezoned to a PD based on "the deference provided local governing bodies and the flexibility created through the Enabling Act." *Sinkler v. County of Charleston,* Op. No. 2008–UP–297 (S.C. Ct.App. filed June 5, 2008), slip op. at 2.

The Court of Appeals found "the circuit court exceeded the applicable scope of review because a reviewing court should practice judicial restraint and not supplant its judgment for the local governing authority's judgment." *Id.* (citing *Bob*

*Jones Univ. v. City of Greenville,* 243 S.C. 351, 133 S.E.2d 843 (1963)). In addition, citing *Lenardis v. City of Greenville,* 316 S.C. 471, 472, 450 S.E.2d 597, 598 (Ct.App.1994), the Court of Appeals stated the appellate court "must leave [the disputed] decision undisturbed if the propriety of that decision is even 'fairly debatable.'" *Id.*

As to the Enabling Act, the Court of Appeals cited the prefatory language in section 6–29–720(C), which states "[t]he zoning ordinance may utilize the following or any other zoning and planning techniques for implementation of the goals specified above. *Failure to specify a particular technique does not cause use of that technique to be viewed as beyond the power of the local government choosing to use it." Id.* at 3 (quoting S.C.Code Ann. § 6–29–720(C)) (alteration and emphasis in original). The court stated "Sinkler [Petitioners] [had] argued the County Council did not avail itself of this curative language because County Council utilized one of the definitions," but that it "need not explore Sinkler's argument as this court defers to the County Council's judgment regarding the plan." *Id.* "In the ordinance, the County Council found that the plan met Article 3.5 of the ZLDR . . . ." *Id.*

The Court of Appeals also found County Council's decision was not arbitrary or capricious, citing *Bear Enterprises v. County of Greenville,* 319 S.C. 137, 459 S.E.2d 883 (Ct.App. 1995). *Id.* "County Council reviewed the plan for the property multiple times and the county staff recommended rezoning the property. Accordingly, County Council's decision was neither arbitrary nor capricious." *Id.* at 3–4.

As to the circuit court's finding that the ordinance conflicted with the provisions of the ZLDR, the Court of Appeals held there was no conflict and nothing to suggest that County Council could not change an ordinance that it created. *Id.* at 4.

The Court of Appeals concluded that, since Petitioners had failed to show that the enacted ordinance conflicted with state law or the ZLDR, that County Council's decision was arbitrary and unreasonable, or that the rezoning violated Petitioners' constitutional rights, it would not substitute its judgment for that of County Council, and it held the circuit court erred in concluding County Council exceeded its lawfully delegated

authority. *Id.* This Court granted a petition for a writ of certiorari to review the decision of the Court of Appeals.

## II.  LAW/ANALYSIS

Petitioners assert the Court of Appeals erred in (1) applying the wrong standard of review, (2) reversing the circuit court's invalidation of the ordinance on the basis it violates the provisions of the Enabling Act, and (3) reversing the circuit court's invalidation of the ordinance on the basis it conflicts with the ZLDR.

Because we find it dispositive, we direct our attention to Petitioners' argument that it was error to reverse the circuit court's determination that the rezoning ordinance was invalid because it violated the Enabling Act.

As noted above, the circuit court ruled the ordinance did not meet the qualifications for a PD as contained in sections 6–29–720 and –740 of the Enabling Act. The circuit court first found a PD requires "housing of different types and densities" and mixed use, as expressed by section 6–29–720.  The court found the only change effected by the zoning ordinance in this case was to reduce the lot sizes so as to allow the property owners to avoid the density restriction mandated by the AG–15 category;  all other factors remained the same as the AG–15 category.

Section 6–29–720 of the Enabling Act defines a PD as follows:

> [A] development project comprised of *housing of different types and densities and of compatible commercial uses,* or shopping centers, office parks, and mixed-use developments. A planned development district is established by rezoning prior to development *and is characterized by a unified site design for a mixed use development[.]*

S.C.Code Ann. §  6–29–720(C)(4) (emphasis added).

The circuit court also found the ordinance violated section 6–29–740 of the Enabling Act, governing "Planned development districts," because it includes "no elements that result in improved design, character, and quality of a new mixed use

development" as required by the statute. Section 6–29–740 states in relevant part that a PD should "result in improved design, character, and quality of new mixed use developments" and, moreover:

The planned development provisions must encourage innovative site planning for residential, commercial, institutional, and industrial developments within planned development districts.

*Id.* § 6–29–740.

The Court of Appeals found the ordinance did not violate the Enabling Act, stating it would defer to County Council's recitation in the ordinance that it satisfied the requirements for a PD and accord County Council the flexibility and authority contemplated in the Enabling Act.

We hold the circuit court properly concluded the ordinance did not meet the parameters for a PD. As found by that court, the *only* effect of the ordinance in this instance was to allow the Walpoles to reduce the lot sizes for the property, thus avoiding the restrictions mandated by AG–15 zoning. The ordinance did not provide for housing of different types and densities and compatible commercial use, and it did not create a new mixed use development as contemplated in the statutes of the Enabling Act. The property continued to have only residential dwellings and the ordinance did not plan for future diversity of development. As noted in the excerpt quoted from section 6–29–740 above, PD plans "must encourage innovative site planning for residential, commercial, institutional, and industrial developments within" the PD districts. S.C.Code Ann. § 6–29–740.

As one treatise has observed, a PD is a zoning method that is used to create a planned mix of residential and commercial uses for the benefit of the community, as opposed to having only a single-use district:

The planned unit development, in contrast to Euclidean zoning which divides a community into districts and explicitly mandates certain uses, . . . is a district in which a planned mix of residential, commercial, and even industrial uses is

sanctioned subject to restrictions calculated to achieve compatible and efficient use of the land.

83 Am. Jur. 2d *Zoning and Planning* § 396 (2003). The goal of a PD district is to have diversification of use and to create, in essence, a self-contained, planned community:

> In addition to facilitating flexibility in zoning, the planned unit development also seeks to grant diversification in the location of structures and other site qualities. Thus, the goal of planned unit development is achieved when an entire self-contained little community is permitted to be built within a zoning district, with the rules of density controlling not only the relation of private dwellings to open space, but also the relation of homes to commercial establishments such as theaters, hotels, restaurants, and quasi-commercial uses such as schools and churches.

*Id.* § 398 (footnotes omitted).

■ The definitions of commentators and courts vary with the kind of planned unit development under discussion, but the description set forth above has been cited by several commentators. *See, e.g.,* 3 Patricia E. Salkin, *American Law of Zoning* § 24:8 (5th ed. 2009) (citing the description and its source, the Supreme Court of Pennsylvania, which applied this definition in *Cheney v. Village 2 at New Hope, Inc.,* 429 Pa. 626, 241 A.2d 81 (1968)). Accordingly, the essence of a PD under the Enabling Act is that the property will provide for mixed use. *See id.* at § 24:9 ("Unlike *Euclidean* zoning which forces land development into a preconceived pattern, planned unit development permits the inclusion of a variety of housing types, lot sizes, and even nonresidential uses on a single tract."); *Palmer/Sixth St. Props., L.P. v. City of Los Angeles,* 175 Cal.App.4th 1396, 96 Cal.Rptr.3d 875, 878 n. 2 (2009) (noting a land use plan adopted for a specific area of Los Angeles defined a "mixed use" project as "[a]ny Project which combines a commercial use with a residential use, either in the same building or in separate buildings on the same lot or lots" (citing Plan, § 4, Definitions)); *Trail v. Terrapin Run, LLC,* 174 Md.App. 43, 920 A.2d 597, 606 (Md.Ct.Spec.App.2007) (stating planned development "means more than just a subdivision or the concept would be unnecessary" and that "[t]he

definition itself 'includes' different uses by virtue of its reference to mixed use development").

■ Respondents alternatively asserted that they did not have to meet the parameters of a PD under the Enabling Act because County Council was free to employ other zoning techniques, citing the prefatory language of section 6–29–720(C) governing zoning methods, which allows County Council to use one of the enumerated techniques or other techniques. We agree with the circuit court that County Council clearly chose to employ the PD process for the Walpoles' property and, once having invoked that technique, it could not arbitrarily fail to meet the requirements for a PD. Consequently, we hold the circuit court correctly ruled the ordinance is invalid because it did not properly establish a PD as contemplated by the terms of the Enabling Act, and we reverse the Court of Appeals' determination on this point.

## III. CONCLUSION

Based on the foregoing, we reverse the decision of the Court of Appeals and hold the circuit court properly invalidated the ordinance rezoning the Walpoles' property from AG–15 to a PD district because the requirements for a PD district under the Enabling Act were not met.

**REVERSED.**[3]

TOAL, C.J., PLEICONES, HEARN, JJ., and Acting Justice JAMES E. MOORE, concur.

■

3. To the extent Petitioners assert the Court of Appeals applied the wrong standard of review, we find no error. The Court of Appeals found Petitioners failed to show the ordinance conflicted with state law or the ZLDR or that County Council had exceeded its lawfully delegated authority. We conclude the cases cited by the Court of Appeals are correct statements of the law in this area. However, because we agree with Petitioners that the circuit court properly invalidated the ordinance on the basis it violated the Enabling Act, we need not reach the remaining argument that the ordinance also violated the ZLDR.